**RESOLUTION TRUST CORPORATION,**
**Receiver for ABQ Federal Savings**
**Bank, Plaintiff,**

v.

**OCOTILLO WEST JOINT VENTURE, an**
**Arizona General Partnership, and Bogle**
**Farms, Inc., an Arizona Corporation,**
**Defendants.**

**No. CIV 92–67 JC/JHG.**

United States District Court,
D. New Mexico.

Nov. 10, 1993.

Robert J. Muehlenweg of Kelly, Rammel-kamp, Muehlenweg, Lucero & Leon and Rita G. Siegel, Albuquerque, NM, for plaintiff and counter-defendant.

L. Michael Messina and Glenn R. Smith of Messina, Madrid & Maynez, Albuquerque, NM, for defendant and intervenor, Bogle Farms, Inc.

Harold D. Stratton, Jr. of Stratton & Ca-vin, Albuquerque, NM, and Robert J. Novak and Mark A. Sippel of Novak & Associates, Phoenix, AZ, for defendant Ocotillo West Joint Venture.

## MEMORANDUM OPINION

CONWAY, District Judge.

THIS MATTER came on for consideration of the Defendant Bogle Farms, Inc.'s Motion for Summary Judgment, filed December 16, 1992 and Plaintiff's Motion for Summary Judgment, filed January 25, 1993. The Court has reviewed the motions and memoranda submitted by the parties, and finds that Defendant's Motion is well-taken and will be GRANTED. The Court further finds that Plaintiff's Motion is not well-taken and will be denied. Also pending before this Court are Defendant's Motions to Strike Affidavits of the RTC Submitted with its Reply Memorandum, filed April 15, 1993 and to Strike the Affidavit of Gini Armstrong, also filed April 15, 1993. The Court finds that the documentary evidence submitted by the parties provides a sufficient basis for this Court's ruling on the pending motions, the Court therefore need not consider the affidavits in question. Defendant's Motions shall therefore be denied as moot. All remaining motions pending in this action shall be denied as moot.

## I. OVERVIEW

The case at bar is troubling because it presents this Court with a difficult situation

in which there is no decisive answer. On the one hand, the Court is faced with the opportunistic use of regulatory power by an agency of the United States Government, namely the Resolution Trust Corporation (RTC). On the other hand, the Court is addressed by a private party who gambled and lost, and now asks this Court to release it from the consequences of its misfortune.

The Resolution Trust Corporation, in its capacity as Receiver for the defunct ABQ Bank (Old ABQ),[1] came into the picture holding itself out to the world as the managing general partner of the Ocotillo West Joint Venture (Ocotillo). RTC/ABQ managed Ocotillo, sold property as the managing general partner of Ocotillo, held itself out to numerous individuals and entities as general partner of Ocotillo and, in fact, RTC/ABQ's attorney in this matter wrote a letter dated March 8, 1991, stating specifically that his firm represented "Ocotillo West Joint Venture and its general partner, ABQ Federal Savings Bank, under receivership of the Resolution Trust Corporation." *See Defendants Exhibit # 43.*

RTC/ABQ's fair weather management of Ocotillo ran aground in December of 1990 when Bogle Farms, one of the Defendants in this action, forced Ocotillo into involuntary Chapter 11 Bankruptcy. When the wind shifted, and RTC/ABQ found that it was no longer expeditious to act as the general partner of Ocotillo, RTC/ABQ repudiated all of its previous representations, and declared that it was not, and had never been the general partner of Ocotillo. RTC/ABQ filed this declaratory judgment action seeking to use its super-regulatory powers to avoid the consequences of its prior acts and representations, and has even gone so far as to ask the same attorney who had some two years previously represented RTC/ABQ to be the general partner of Ocotillo, to come into this Court, and, with a straight face, argue that RTC/ABQ had never been the general partner of Ocotillo.

One can just imagine RTC officials sitting around a conference table with their attorneys and examining Ocotillo's situation. They were presented with a serious problem because sometime in the spring of 1991 someone had figured out that if RTC/ABQ was really the general partner of Ocotillo, it was going to have creditor priority problems in the bankruptcy action. Someone, at this point, probably said something to the effect of "well, if we switch around a few ledger entries, repudiate all of our previous representations and then scream *D'Oench, Duhme* and 12 U.S.C. § 1823(e) very loudly, we might be able to come out on top." At this point, I imagine that what followed was much back slapping and rejoicing, with everyone leaving the conference room arm-in-arm singing the RTC fight song [to the tune of "Onward Christian Soldiers"],

Onward Banking Soldiers,

Marching as if to war,

With *D'Oench, Duhme* and Congress

We'll prevail for sure.

We needn't worry,

We will win the fight

Since we lack accountability,

We are always right ...

Neither is Bogle Farms without responsibility for its own misfortune. Bogle Farms entered into a land sale transaction with Ocotillo Joint Venture in July of 1984 wherein Bogle apparently decided that rather than receive payment in full for the property it transferred to Ocotillo, that it would take a gamble on the possibility of greater profits in the future. Bogle's gamble failed, but, while lamenting its bad luck with weeping and gnashing of teeth, Bogle fortuitously spotted a glimmer of light coming from the end of its proverbial tunnel. With the aid of its lawyers it developed a defense theory based on RTC/ABQ's on-again/off-again general part-

---

1. Throughout this opinion, I shall use **RTC/Old ABQ** when I am referring to the RTC acting in its capacity as receiver or conservator of the original banking entity. I shall use **RTC/New ABQ** when I am referring to the RTC acting in its capacity as conservator or receiver of the newly created banking entity. When the distinction between the old and new entities is not important, or when both entities have engaged in the action(s) described over a period of time, I shall refer to the entities jointly as **RTC/ABQ.**

nership in Ocotillo. Under this theory, Bogle claims, despite its status as an unsecured creditor of Ocotillo, that it should be paid out of Ocotillo's assets before RTC/ABQ.

The Court's disposition of this action is largely based on the factual background presented by the parties, with a smattering of equity mixed in for good measure. While the Court finds that neither party is particularly deserving of an equitable disposition in this matter, equity and law slightly favor a grant of summary judgment in favor of the Defendant, Bogle Farms. RTC's regulatory power may be awesome, but it does not empower nor authorize the RTC to alter its status, in chameleon-like fashion, to make the most of the prevailing environment.

## II. BACKGROUND

The matter presently before this Court is a declaratory judgment action filed by RTC/ABQ against Bogle Farms and Ocotillo West Joint Venture. RTC/ABQ and Bogle have each filed summary judgment motions, and both agree that summary judgment is the appropriate disposition of this matter. The material factual allegations underlying this matter are either not in dispute, or have been stipulated for purposes of these motions.

RTC/ABQ filed this declaratory judgment action in an effort to resolve certain issues, relating to creditor priority, which arose in the Ocotillo Title 11 action currently pending in the Bankruptcy Court for the District of Arizona. The Judge in that action lifted the bankruptcy stay to permit this action to be filed.

### A. Ocotillo's Relationship with Bogle

Ocotillo is a joint venture formed under the laws of the state of Arizona. At present, the primary assets of Ocotillo are approximately 523 acres of real property, an adjoining 27–hole golf course and approximately 70 acres of lakes in a "master planned community" located in Chandler, Arizona.

On or about January 22, 1988, ABQ Development Corporation (ABQD) and Amrock Enterprises, Inc. (Amrock),[2] both New Mexico Corporations, entered into an agreement known as the Third Amended and Restated Partnership Agreement of Ocotillo West Joint Venture (Partnership Agreement). The Partnership Agreement establishes Ocotillo as a general partnership between ABQD and Amrock, governed by the Arizona Uniform Partnership Act and Arizona Law, except where modified.

In July of 1984, Bogle Farms, Inc. (Bogle Farms or Bogle)—a closely held family corporation organized under Arizona law and conducting business in farming and related endeavors in Arizona, New Mexico and Missouri—conveyed approximately 1,040 acres of raw land to Ocotillo's predecessor in interest.[3] Bogle Farms was paid $20,000,000.00 cash in return for approximately 700 acres of this property which, in its entirety (all 1,040 acres) became known as Phase I of the venture. Payment for the 340 acres for which Bogle was not compensated was covered by the terms of the Option Contract discussed below. Despite the fact that Bogle had not been paid for the entire parcel, title to the entire Phase I property passed directly to Ocotillo, with no liens or other encumbrances remaining in Bogle.

On July 4, 1984, as part of the same transaction described above, Ocotillo and Bogle entered into a contract, known as the "Option Contract," which covered approximately 1,500 acres directly south of the Phase I property (Phase II). The Option Contract was recorded on December 12, 1984, in Maricopa County, Arizona at recorder's numbers 84–549961 and 84–557730. The terms of the Option Contract required Ocotillo to make purchases of Phase II property, over a period of years, at specified escalating prices. In conjunction with the Option Contract, Bogle conveyed the approximately 340 acres discussed above to Ocotillo to be used for "common areas" in the Ocotillo development (com-

---

**2.** ABQD is a wholly owned subsidiary of Old ABQ. Amrock was a wholly owned subsidiary of ABQD.

**3.** For purposes of this motion, it is not necessary to distinguish between the various iterations of Ocotillo West Joint Venture. Therefore, the Court shall collectively refer to all such entities as Ocotillo.

mon area). In accordance with the Option Contract, Bogle was to be paid for this common area as Ocotillo exercised its options. That is, whenever an option was exercised, a certain percentage of the payment for the additional land was to be allocated to the purchase price of the common area.

While it is not absolutely clear under the facts presented to the Court, it appears that Bogle was motivated to transfer the 340 acres, without maintaining a security interest in the property, in an effort to, in effect, participate in the development of Ocotillo. That is, Bogle was willing to forego payment for the land in exchange for the expectation of a greater sales price in the future. What Bogle did not anticipate, however, was the breach of the Option Contract which ultimately propelled Bogle Farms into the position of an unsecured creditor.

The other Ocotillo debts with which Bogle competes are three notes, originated independently, which were guaranteed by recorded security interests taken in the Phase I property. The present dispute arises out of the payment priority of the "Valley," "Coventry" and "Security Pacific" notes (collectively the "Notes"),[4] relative to the payment priority of Bogle's unsecured debt. RTC/New ABQ is the present "holder" of all three notes and is claiming that it should be given priority as a "secured creditor," with a perfected security interest in the assets of Ocotillo. Bogle, as an unsecured creditor, is seeking to collect the money it is allegedly owed, under the terms of the Option Contract, for the remaining unpaid portion of the common area.

### B. The Notes

Bogle is attempting to have RTC/New ABQ's claims on the Notes subordinated to its own claims on the basis that RTC/ABQ was and is the general partner in Ocotillo. Under Arizona law, Bogle claims that as general partner, RTC/New ABQ is only entitled to payment after all "outside" creditors have been paid. Therefore, whether RTC/New ABQ's claims should be subordinated to the unsecured debt owed to Bogle turns pri-

marily on the determination of RTC/New ABQ's status in relation to Ocotillo.

### 1. The Valley Note

The Valley Note, a $40,000,000.00 loan to Ocotillo made by Valley National Bank of Arizona (VNB) and Sunwest Bank of Albuquerque (Sunwest), was originated on April 9, 1985. The note was apparently originated to provide working capital for the Ocotillo development. As security for the note, Ocotillo executed a deed of trust and assignment of rents covering all real property owned by Ocotillo. VNB and Sunwest thereby acquired a first priority lien in all Ocotillo property which was perfected by recording on April 12, 1985, in Maricopa County, Arizona, at recorder's number 86–161956. VNB originated the loan with full knowledge of Ocotillo's Option Contract with Bogle, and, in fact, acquired a security interest [recorded at Maricopa County, Arizona recorder's numbers 85–290883 and 85–290884] permitting VNB to acquire property under the Option Contract in the event that Ocotillo failed to do so.

By the fall of 1989, Ocotillo had paid the Valley Note down to approximately $20,000,-000.00, but could not meet its future obligations on the note. VNB and Sunwest were not inclined to renew or alter the terms of the note, and were considering foreclosing on the property. ABQ elected to purchase the Valley Note from VNB and Sunwest for the discounted price of $16,000,000.00 in cash. The note has never been paid off by Ocotillo, and remains in the possession of RTC/New ABQ.

From the point where Old ABQ acquired the Valley Note in January of 1990, the Note was treated as a capital contribution to Ocotillo on both Ocotillo and ABQ's internal records. However, in November of 1990, RTC/New ABQ ordered the records changed to record the Valley Note as a loan from New ABQ to Ocotillo. Specifically, the journal entry for the Note was moved from ABQ's Real Estate Owned account to a note receivable account, and from Ocotillo's "ABQ Capi-

---

4. As used in this opinion, the term Notes includes the actual note, the loan agreement and the deed of trust associated with each of these instruments.

tal Account" account to a note payable account.

### 2. Coventry Note

On or about March 31, 1987, Coventry executed a promissory note and loan agreement in favor of VNB in the amount of $2,520,000.00. The note was secured by a deed of trust granting VNB a security interest in certain of Coventry's real property including leases, rents and proceeds thereof. This security interest was perfected on April 1, 1987 by recordation with the Maricopa County, Arizona recorder's office at recorder's number 87–198038. On December 13, 1988, VNB, for cash consideration, assigned its right, title and interest in the Coventry Note to Old ABQ. On December 27, 1988, Coventry, by warranty deed [recorded on December 28, 1988 at Maricopa County, Arizona recorder's number 88–628224], assigned all of its rights, title and interest in the real property to Ocotillo, and Ocotillo assumed Coventry's obligations under the Coventry Note. The assignment of the note from VNB to Old ABQ was recorded on December 28, 1988 at Maricopa County recorder's number 88–610132. This note, in contrast to the Valley and Security Pacific Notes, has always been listed as an "account payable" in Ocotillo's records.

Pursuant to a Stipulated Order Authorizing Use of Cash Collateral entered July 31, 1992 by the Bankruptcy Court, RTC/New ABQ's lien on the collateral securing the Coventry Note was replaced by a first priority lien and security interest on certain other real property.

### 3. Security Pacific Note

The Security Pacific Note was originated on November 3, 1988, when Ocotillo executed a note in favor of ABQ Investments in the amount of $1,650,000.00. As security for the note, Ocotillo executed a deed of trust on certain real property. ABQ Investments perfected its security interest in this Ocotillo property through recordation on November 18, 1989 at Maricopa County Recorder's Number 88–5576368.

On January 11, 1989, ABQ Investments assigned all its right and interest in the note to Arizona Bank. Arizona Bank recorded the assignment on January 31, 1989 at Maricopa County Recorder's Number 89–046148. On September 14, 1990, Security Pacific Bank of Arizona (successor in interest to Arizona Bank) assigned all of its rights and interest in the note to RTC/New ABQ. RTC/New ABQ recorded the assignment on October 4, 1990 at Maricopa County Recorder's number 90–449586. The acquisition of the Security Pacific Note was reflected on Ocotillo's August, 1990 internal accounting records as an addition to New ABQ's Capital–Advances account, and on New ABQ's August, 1990 internal accounting records as an addition to New ABQ's Real Estate Owned (REO) account.

### C. The Settlement and Amendment and Waiver Agreements

By December 31, 1989, Ocotillo had allegedly breached the Option Contract by failing to make its required purchase of additional property. As a result, the Option Contract terminated, and Bogle made a demand under the terms of the contract for either, 1) the return of that portion of the common area which had not yet been paid for, or 2) cash payment for the remaining, unpaid portions of the common area.

Ocotillo apparently failed to fulfill its duties under the Option Contract largely due to financial strain under which its parent, ABQD, was operating. ABQD had in the past borrowed money from its parent corporation, Old ABQ, to meet its obligations. By late 1989, however, ABQD owed large sums of money to Old ABQ. Old ABQ's ability to come to the aid of its subsidiary, ABQD, was severely restricted by this time, because, commencing November 14, 1989, the Office of Thrift Supervision (OTS) was closely monitoring the activities of Old ABQ pursuant to a Consent Agreement. Under the terms of the Consent Agreement, Old ABQ was prohibited from entering into any significant transactions without OTS approval. Old ABQ was also prohibited from entering into any contractual agreement with any affiliated person, subsidiary or agent of Old ABQ, including ABQD.

ABQD and Ocotillo were facing foreclosure on the Valley Note. To prevent the foreclosure, Old ABQ decided to "upstream" the Ocotillo property from ABQD to Old ABQ, thereby allowing Old ABQ to make the payments on the loan. The Board of Directors of Old ABQ, at a Special Meeting held on November 13, 1989, passed a resolution to transfer Ocotillo from ABQD to Old ABQ. Specifically, this resolution stated,

> [T]he Board of Directors of ABQ Bank ... believe it is in the best interest of the Bank to proceed with the transfer of the Ocotillo Joint Venture to the Bank; it is
>
> RESOLVED, that the Bank will proceed with ABQ Development Corporation, a wholly owned subsidiary of the Bank, and transfer of [sic] 100% of its general partnership interest in the Ocotillo West Joint Venture to the Bank.

*Defendant's Exhibit # 10.*

To effectuate this transfer, Old ABQ and ABQD entered into a "Settlement Agreement" which provided for the transfer of Ocotillo from ABQD to Old ABQ in exchange for the forgiveness of ABQD's debt to Old ABQ. The Settlement Agreement was approved in principal by the Board of Directors of Old ABQ at a special meeting on November 29, 1989. Specifically, the minutes of the meeting state,

> The Chairman presented and reviewed the proposed Ocotillo West Joint Venture Settlement Agreement between ABQ Development Corporation and ABQ Bank, a Federal Savings Bank. The Settlement Agreement provides for the transfer to the Bank of the Ocotillo West Joint Venture in satisfaction of certain debts owed by ABQ Development to the Bank.... A motion was made, seconded, and unanimously carried to resolve that the Board of Directors approve the Settlement Agreement in principal and to authorize the Officers of the Bank to execute the Settlement Agreement on behalf of ABQ Bank.

*Defendant's Exhibit # 9.* The Resolution adopted by the bank provides specifically that,

> the officers of the Bank are authorized and directed to execute all documents necessary to carry out the Agreement and are

further authorized to seek and obtain any necessary approvals from the Office of Thrift Supervision prior to entering into the Agreement.

*Id.* Both the transfer of the Ocotillo Property and the acquisition of the Valley Note were restricted transactions under the terms of the OTS Consent Decree, and therefore Old ABQ sought permission from OTS to engage in these transactions. Correspondence between Old ABQ and OTS in regard to the transaction began as early as November 16, 1989, when M.G. Kieswetter of the OTS was contacted by counsel for Old ABQ. In relevant part, the letter states,

> The Project will be transferred to the Bank in satisfaction of the Obligations by an assignment by Development of its joint venture interest and of its interest in Amrock.... Upon transfer of the Joint Venture to the Bank, the Bank intends to treat the interest in the Joint Venture and in Amrock as REO properties, that is, properties acquired in connection with a debt previously contracted.... Because the Joint Venture will be treated as an REO property, as described above, the Bank should not need waivers of equity risk investment limitations or investment in service corporation limitations for its consequent direct ownership of Amrock.... The transfer of the Joint Venture to the Bank requires the consent of Valley [National Bank of Arizona].

*Defendant's Exhibit # 61(a).* As shown in the letter, VNB, at the time the primary creditor of Ocotillo, was asked for its approval of the transfer of Ocotillo to Old ABQ. In a November 22, 1989 letter from Old ABQ counsel to Kieswetter, the transaction, specifically VNB's approval of the transaction, is again discussed. In relevant part the letter stated,

> Here is a copy of Valley National's consent to the proposed transfer by ABQ Development Corporation of its interest in the Ocotillo West Joint Venture to ABQ Bank. Valley appears to have slightly misunderstood the transaction in that its letter contemplates the transfer to ABQ Bank of Amrock Enterprises' interest in the Joint Venture instead of the proposed transfer

of Amrock's stock. Valley is looking at revising its consent accordingly.

*Defendant's Exhibit # 61(b).* On November 29, 1989, VNB's revised consent was forwarded from Old ABQ counsel to Kieswetter. *See Defendant's Exhibit # 61(c).*

The OTS, through Kiesewetter, responded in a December 6, 1989 letter to David E. Weymouth, President of Old ABQ. This letter stated in pertinent part,

> As we understand it, the proposal involves the transfer from ABQ Development to the institution [Old ABQ] of ABQ Development's entire interest in the Octillo [sic] Project ("Project") which is located near Phoenix, Arizona. In his letter, Mr. Heyman [Old ABQ counsel] states that this transaction was approved in principle by the board of directors at a meeting held on November 13, 1989. For our records, please provide us with a copy of a board resolution that confirms this approval or some other similar documentation.... Upon receipt of the above information, we will provide you with our written decision on this matter.

*Defendant's Exhibit # 61(d).* In the midst of Old ABQ's quest to gain OTS approval of the Ocotillo transfer, VNB decided to make an offer to discount the Valley Note if Old ABQ would pay it off immediately. This offer was transmitted to OTS on January 5, 1990 by Old ABQ. *See Defendant's Exhibit # 61(e).* A final letter was sent by Ralph E. Peters, Old ABQ's Vice Chairman, to Kieswetter on January 5, 1990. In this letter, Peters summarized the transactions for which Old ABQ sought OTS approval. *See Defendant's Exhibit # 61(g).*

In response to the Old ABQ request, on January 11, 1990, M.G. Kiesewetter of the OTS faxed a letter to Keith Heise, Chief Financial Officer of Old ABQ, which stated in relevant part,

> Based on our review, it appears that the retirement of the Ocotillo [Valley] note possesses economic merit and is in the best interests of the Institution [Old ABQ]. We also understand that the payment of this debt is part of a plan to satisfy ABQ Development's overdraft of approximately $14 million at ABQ Bank by upstreaming

the Ocotillo property to ABQ Bank. Therefore, I take no supervisory object, under the Consent Agreement, to the proposed transaction.

*Defendant's Exhibit # 25.* As a result, Old ABQ paid off the Valley Note, and Old ABQ and ABQD entered into an agreement consisting of two documents, 1) a Settlement Agreement, and 2) an Amendment and Waiver Agreement. The Settlement Agreement provides in relevant part,

> Development owns, beneficially and of record, 50,000 shares of the common stock (the "Stock") of Amrock Enterprises, Inc., a New Mexico corporation ("Amrock"). constituting 100% of the issued and outstanding stock of Amrock, and a partnership interest (the "Interest") in Ocotillo West Joint Venture, an Arizona general partnership (the "Joint Venture"), under the Third Amended and Restated Partnership Agreement of Ocotillo West Joint Venture. The Joint Venture is indebted to Development in the approximate principal amount of $55,000,000.00 (the "Joint Venture Debt"). Development wishes to transfer the Stock and the Interest to Bank, after forgiveness of the Joint Venture Debt, in payment of ... indebtedness of Development to Bank....
>
> ....
>
> Development represents and warrants to Bank that the net realizable value of the Joint Venture (after giving effect to the forgiveness of the Joint Venture Debt) on the date of this Agreement (the "Net Value") is $28,000,000.

*Defendant's Exhibit # 14.* The Amendment and Waiver Agreement provides in relevant part,

> ABQ Bank, A Federal Savings Bank ("ABQ") and Amrock Enterprises, Inc., a New Mexico corporation ("Amrock") agree:
>
> 1. *Recitals.* ABQ Development Corporation, a New Mexico Corporation ("Development"), and Amrock are parties to a Third Amended and Restated Partnership Agreement of Ocotillo West Joint Venture dated as of January 22, 1988 (the "Partner-

ship Agreement") pursuant to which Development and Amrock are partners in Ocotillo West Joint Venture, an Arizona general partnership (the "Joint Venture"). Pursuant to a Settlement Agreement executed and delivered contemporaneously with this Agreement (the "Settlement Agreement"), Development agrees to transfer its interest in the Joint Venture to ABQ. ABQ and Amrock wish to amend the Partnership Agreement in certain respects and ABQ has requested Amrock, and Amrock is willing, to waive certain of its rights under the Partnership Agreement.

2. *Amendments.*

(a) Each reference to Development in the Partnership Agreement is changed to a reference to ABQ.

. . . .

5. *Effectiveness.* This Agreement shall be effective upon its execution and delivery by ABQ and Amrock, effectiveness of the Settlement Agreement and the receipt by ABQ of the written consent to this Agreement by the Office of Thrift Supervision.

*Defendant's Exhibit # 15.* Also on January 11, 1990, VNB, Sunwest Bank (Sunwest), Old ABQ and Ocotillo entered into an agreement wherein Old ABQ would pay in excess of $16,000,000 in cash to VNB and Sunwest. In consideration for the payment, VNB and Sunwest gave Old ABQ an assignment of all of their right, title and interest in the Valley Note, discussed more fully above, and endorsed the Note to Old ABQ. Bogle was provided with an copy of this agreement in August of 1990.

The documents submitted by the parties leave no doubt that at the time the Settlement Agreement, Amendment and Waiver Agreement and Valley Note acquisition were consummated, Old ABQ was of the understanding that OTS had approved the transactions and that the Bank had become the managing general partner of Ocotillo. In a letter dated January 15, 1990, Old ABQ's counsel provided his legal opinion as to the force and effect of the transactions,

We have advised you in connection with the purchase by ABQ Bank . . . of a note

of Ocotillo West Joint Venture (the "Joint Venture"), and related liens from Valley National Bank of Arizona related to the "Ocotillo Project" for an amount equal to the principal and accrued interest on the note, less a discount. Concurrently with the purchase of the note, ABQ acquired the interest of ABQ Development Corporation, a subsidiary of ABQ ("Development"), in the Joint Venture and the stock of Amrock Enterprises, Inc., a subsidiary of Development, and the other partner in the Joint Venture ("Amrock"), from Development in satisfaction of certain debt of Development to ABQ.

In connection with our advice, we have reviewed applicable law (including the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA")) and regulations, the Consent Agreement effective November 14, 1989 between ABQ and the Office of Thrift Supervision ("OTS"), a letter dated January 11, 1990 from OTS to ABQ (the "Kieswetter Letter"), drafts of the agreements pursuant to which the note was purchased by ABQ and the partnership interest in the Joint Venture and the stock of Amrock were transferred to ABQ, letters from us to OTS concerning the transaction and reports from officers of ABQ of their communications with OTS personnel concerning the transaction. From the latter two items, we think that appropriate officials of OTS were fully advised as to the nature and details of the transaction.

. . . .

*Consent Agreement.* Several aspects of the transaction could be seen as violating the various operating restrictions imposed on ABQ under the Consent Agreement. However, under the Kieswetter Letter, OTS "take[s] no supervisory objection, under the Consent Agreement, to the . . . transaction." That operates as the consent of OTS, which waives the relevant restrictions of the Consent Agreement.

*Defendant's Exhibit # 29.*

Presumably due to the continued deterioration of Old ABQ's financial condition, on

February 8, 1990, less than one month after the consummation of the above described transactions, OTS appointed RTC as conservator of Old ABQ. On March 15, 1990, RTC was appointed as receiver of Old ABQ, replacing the previous conservatorship with a receivership. Also on March 15th, the OTS authorized the incorporation of and the issuance of a federal charter for New ABQ to take over the assets of Old ABQ. RTC was appointed as conservator of New ABQ, and substantially all of the assets of Old ABQ, including the Valley, Coventry and Security Pacific Notes, were then transferred to New ABQ.

### D. RTC/ABQ's Actions as General Partner

RTC, from the time it took over as conservator, was clearly convinced that ABQ Bank had become the managing general partner of Ocotillo. As a result, RTC ran Ocotillo and held itself out to the world as the managing general partner of Ocotillo for a period of approximately 15 months. Following is a chronological list of actions taken by RTC in its capacity as conservator and receiver of ABQ Bank:

April, 1990 Mr. James Reich, who held himself out to be an officer of both New ABQ and ABQD, met with representatives of Bogle and asked for an extension of time on Ocotillo's Option Contract obligation. Bogle consented to an extension;

May 31, 1990 Ocotillo advised the Arizona Liquor Department that RTC/New ABQ was now its managing partner in place of ABQD;

June 30, 1990 The formal extension of time for payment or reconveyance under the Option Contract, which had been granted by Bogle in April of 1990, expired, without either a payment or reconveyance;

July 12, 1990 Donald McCann, RTC's Managing Agent, executed notarized documents confirming that RTC was the managing partner of Ocotillo. These documents were prepared by RTC attorneys, and McCann testified that he executed these documents because he believed that they were in the best interests of the RTC;

July, 1990 Representatives of RTC/New ABQ met with representatives of Bogle to discuss Bogle's claim against Ocotillo. A series of negotiations followed, and Ocotillo and "its managing partner ABQ Federal Savings Bank, through its conservator, the Resolution Trust Corporation," and agreed to produce certain financial information and other documents to Bogle pursuant to a Confidentiality Agreement, executed August 13, 1990;

July 2, 1990 ABQD granted RTC/New ABQ an additional security interest in certain real and personal property in an amount not to exceed $100,000,000;

September 14, 1990 Security Pacific Bank Arizona, as successor in interest to Arizona Bank, assigned all of its right, title and interest in the Security Pacific Note and Deed of Trust to RTC in its capacity as conservator for New ABQ. The acquisition of the Security Pacific Note was reflected on Ocotillo's August, 1990 internal accounting records as an addition to New ABQ's Capital–Advances account, and on New ABQ's August, 1990 internal accounting records as an addition to New ABQ's Real Estate Owned (REO) account;

October 19, 1990 RTC/New ABQ executed a deed in which it represented itself to be the general partner of Ocotillo. The deed transferred certain properties owned by Ocotillo to the Chandler School District;

November 7, 1990 Bogle filed suit against Ocotillo (for breach of the Option Contract) in the Arizona State District Court;

November, 1990 RTC/New ABQ changed its internal bookkeeping entries [made in January of 1990] to show the Valley Note as a "note payable" on Ocotillo's books and as a "note receivable" on RTC/ABQ's books;

December 21, 1990 Bogle commenced involuntary Chapter 11 Bankruptcy proceedings against Ocotillo [Docket Number 90–13512 PHX/SCC]. An order of relief on this action was entered July 22, 1991.

January, 1991   RTC/New ABQ applied for a liquor license for Ocotillo, and presented an applicant/controlling person affidavit stating that RTC/New ABQ was the managing partner of Ocotillo. Attorneys for the RTC confirmed in writing to Arizona officials that RTC/New ABQ was Ocotillo's managing partner;

February 6, 1991   RTC/ABQ entered into an agreement on behalf of Ocotillo to sell substantially all of Ocotillo's assets to a third party. RTC/ABQ explicitly represented that it was the managing partner of Ocotillo.

February 28, 1991   OTS appointed RTC to act as Receiver of New ABQ, replacing the previously enacted Conservatorship;

March 5, 1991   James Reich, who held himself out to be an officer of New ABQ, testified in a deposition for the bankruptcy action that RTC/New ABQ was the managing partner of Ocotillo;

March 8, 1991   Robert Muehlenweg, RTC/ABQ's counsel in this action, wrote a letter confirming that RTC/New ABQ was the general partner of Ocotillo to satisfy a condition of a sale of Ocotillo property.

March 19, 1991   Jennifer Nore, Counsel for Ocotillo stated to the Arizona Bankruptcy Court that "the joint venture is comprised of SBQ [sic] Bank ... and Amrok [sic] Enterprises, Inc., a whole new subsidiary";

April 11, 1991   RTC/New ABQ and Amrock, as partners of Ocotillo, resolved to withdraw Ocotillo's objections to the involuntary Chapter 11 petition filed by Bogle;

April 22, 1991   In a case then pending before another Judge in the District of New Mexico [Civ 91–385M], the Poole Law Firm, representing the RTC, stated in a motion to dismiss that RTC/New ABQ had become the managing general partner of Ocotillo by virtue of the January 11, 1990 transactions;

May 7, 1991   RTC counsel advised Bogle counsel that OTS had consented to the settlement agreement;

May 15, 1991   Attorneys representing RTC/ABQ and Ocotillo simultaneously represented that RTC/ABQ was not, and never had been a partner in Ocotillo.

June 26, 1991   The Board of Directors of ABQD held a meeting—attended by Robert Muehlenweg, RTC/ABQ's counsel in this action—wherein the status of ABQD relative to Ocotillo was addressed. The following commentary appears in the minutes of the meeting:

The President advised the Board that new information came to his attention in late May, 1991 that the Corporation is still the managing joint venturer of the Ocotillo West Joint Venture ("OWJV"). Previously, the President and the Board thought that the January 11, 1990 Settlement Agreement between ABQ Bank and the Corporation and the Waiver and Amendment Agreement [sic] between ABQ Bank and Amrock Enterprises, Inc. ("Amrock") acted to make ABQ Bank the managing joint venturer of OWJV. However, it now appears that although the Office of Thrift Supervision ("OTS") may have approved "upstreaming the Ocotillo project to ABQ Bank", it never formally approved the Settlement Agreement or the substitution of ABQ Federal Savings Bank for the Corporation as partner in OWJV. Instead, the January 11, 1990 Settlement Agreement, if effective, transferred only the Corporation's beneficial partnership interest to the Bank.... Upon motion duly made, seconded and unanimously carried, the Board resolved that the Corporation would reassume its role as managing joint venturer of OWJV and directed the President to take all necessary and appropriate steps to confirm actions taken by ABQ Bank on behalf of OWJV during the prior year and correct the partner status of OWJV with third parties.

As of

March 18, 1993   The most recent books of Ocotillo continue to reflect the existence of a partner capital account of ABQ Bank.

The import of these actions is twofold. First, the fact that RTC/ABQ operated Ocotillo, and made numerous representations and attestations that RTC/ABQ was the

managing general partner of Ocotillo clearly indicates that all of the parties involved viewed the January 11, 1990 transactions as having transferred ABQD's partnership interest and control to Old ABQ. That is, through their actions, the RTC officials who were running New ABQ demonstrated that they believed that both the Settlement Agreement and the Amendment and Waiver Agreement were valid, and had been approved by OTS.

Second, RTC/ABQ was able to control the operations of Ocotillo, to the benefit of the Bank, and to the detriment of Bogle, for over a year. It should be noted that while the facts presented do not necessary demonstrate that RTC/New ABQ's actions, as a whole, put Bogle in a worse position than it would have been in had ABQD continued to manage Ocotillo, at least two actions—namely the extension on the Option Contract granted by Bogle in favor of RTC/New ABQ and the October, 1990 conveyance of a portion of the common area to the Chandler School District—could be viewed as directly detrimental to Bogle's position.

### III. REGULATORY ESTOPPEL

#### A. D'Oench, Duhme Estoppel

■ The first type of estoppel claimed by the RTC is based in the common law, and founded on the United States Supreme Court's 1942 opinion, *D'Oench, Duhme & Co. v. F.D.I.C.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956. This type of estoppel has been recently summarized by the Tenth Circuit,

> The Supreme Court recognized that § 12B of the Federal Reserve Act evidenced a federal policy "to protect [the FDIC], a federal corporation, from misrepresentations made to induce or influence the action of [the FDIC], including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans." Accordingly, the Court said that if the secret agreement asserted in *D'Oench* were allowed as a defense, the maker of the note would be enabled to defeat the purpose of the statute "by taking advantage of an undisclosed and fraudulent ar-

rangement which the statute condemns and which the maker of the note made possible." The breadth of the *D'Oench* doctrine is indicated by the Court's illustrations and comments that follow:

> 'The defendant may not have intended to deceive any person, but when she executed and delivered to the plaintiff bank an instrument in the form of a note, she was chargeable with knowledge that, for the accommodation of the bank, she was aiding the bank to conceal the actual transaction. Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.'

*D'Oench,* 315 U.S. at 459, 62 S.Ct. at 680 (quoting *Mount Vernon Trust Co. v. Bergoff,* 272 N.Y. 192, 5 N.E.2d 196, 197 (1936)).

The Court further stated:

> Plainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners. If the bank had wilfully padded the bank's assets with the spurious note in order to obtain insurance from respondent, there seems no doubt but that § 12B(s) would have been violated. Moreover, as we have seen, the inability of an accommodation maker to plead the defense of no consideration does not depend on his commission of a penal offense. *The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.*

*Oklahoma Radio Assoc. v. F.D.I.C.,* 987 F.2d 685, 691 (10th Cir.1993) (citations omitted, emphasis in original).

On its face, the *D'Oench* doctrine is not applicable to the situation at bar. First, there has been no showing that Bogle is

attempting to enforce any agreement, secret or otherwise, that it had with ABQ Bank. Bogle is not even attempting to enforce the terms of the Settlement Agreement and Amendment and Waiver Agreement (agreements to which it was not even a party), rather, Bogle is utilizing these agreements as evidence in support of its priority rights as a bankruptcy creditor of the Ocotillo partnership. The force and effect of these agreements, however, is relevant to the question of whether RTC/ABQ became the managing partner of Ocotillo. Because Bogle was not a party to either agreement, and because there is not any indication that Bogle was intended to be a third party beneficiary, it is doubtful that Bogle would even have standing to enforce the terms of these agreements. In contrast, the situation before the Court is somewhat akin to a dispute over the ownership of land, where a purchaser is attempting to show that the previous owner had valid title to the land. The subsequent purchaser may not be able to enforce the terms of previous purchase agreements, but he will garner the benefits of those agreements if they are valid.

■ Second, Plaintiff has failed to make any showing that it was misled or was likely to be misled by the Settlement Agreement and Amendment and Waiver Agreement which purported to make Old ABQ the managing partner of Ocotillo. When compared to the typical case in which a bank is attempting to utilize the *D'Oench* doctrine, this situation is unique in that the banking authorities were already involved in the operations of the bank at the time that the documents were executed. During the period in which the documents were executed, Old ABQ was operating under an OTS Consent Decree, and an OTS representative was present at the Old ABQ Special Meetings of the Board of Directors, held on November 17, 1989 and November 29, 1989, wherein, respectively, the resolutions approving the transfer of Ocotillo to Old ABQ and the Settlement Agreement were adopted. *See Defendant's Exhibit # 9.*

The January 11, 1990 letter from M.G. Kieswetter of the OTS to R. Peters of Old ABQ also evidences the OTS's knowledge and, at the very least, tacit approval of the Settlement Agreement. *See Defendant's Exhibit # 25.* In addition, both the Settlement Agreement and Amendment and Waiver Agreement, by Plaintiff's admission, were contained in the Bank's files. The Bank's journal entries also depicted the transaction. Finally, RTC's actions, in which it held RTC/New ABQ out to be the managing general partner of Ocotillo, plainly demonstrate RTC's knowledge of the January 11, 1990 documents, and further demonstrate that the RTC was not mislead as to the force and effect of the transactions.

■ Even if, *ad arguendo,* the *D'Oench* doctrine could be applied to the facts in this case, under the Tenth Circuit's *Oklahoma Radio Associates* case, the *D'Oench* doctrine only precludes the defendant from using an agreement as a defense where it can be shown that the person seeking to enforce the agreement "lent himself to a scheme or arrangement by which the banking authority 'was or was likely to be misled.' " *Oklahoma Radio Associates,* 987 F.2d at 694. Plaintiff has presented absolutely no evidence which would indicate that Bogle lent itself to such a scheme or arrangement. For the reasons expressed, the *D'Oench* doctrine is, on its face, not applicable to the current action.

### B. 12 U.S.C. § 1823(e)

■ The second type of estoppel that Plaintiff raises in the face of Bogle's arguments is the statutorily created protection that the RTC enjoys under 12 U.S.C. § 1823(e). Section 1823(e) provides that,

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation [FDIC or RTC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said

board or committee, and (4) shall have been, continuously, from the time of execution, an official record of the bank.

This section, like *D'Oench,* was never intended to apply to situations such as the one at bar. First, as discussed more completely above, Bogle is not attempting to enforce any agreement which can be construed as "tend[ing] to diminish or defeat the right, title or interest of the Corporation [FDIC or RTC] in any asset," and therefore cannot be said to have an adverse interest to RTC/ABQ under the terms of the agreement. In contrast, Bogle is utilizing these agreements as *evidence* of RTC/ABQ's partnership in Ocotillo.

■ Second, the Supreme Court, in *Langley v. F.D.I.C.,* 484 U.S. 86, 91–92, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987), set out two purposes behind the statute,

One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets.... A second purpose of § 1823(e) is implicit in its requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of the note and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

As discussed in regard to *D'Oench* estoppel, there is every indication that the OTS and RTC knew of the Settlement Agreement and Amendment and Waiver Agreement, and further, there is no dispute that each of these documents were contained within ABQ Bank's records from the time of execution. Therefore, neither of these purposes is implicated in the present action, nor would either interest be served by the application of § 1823(e) to this situation.

■ Finally, even if this Court were to apply 12 U.S.C. § 1823(e) to this situation, all but one of the requirements of the section are satisfied. The first and fourth requirements of § 1823(e) are not in dispute. The second prong, requiring that the instrument be "executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank," is not satisfied, and, under the circumstances of this case cannot be satisfied. However, as discussed previously, Bogle does not have an interest adverse to ABQ Bank under the terms of the document, rather it is only an indirect result of the agreements which is adverse to RTC/ABQ. Further, to require execution by Bogle in this matter would be nonsensical. Bogle was not a party to the agreements, has no interest under the agreements and cannot even be said to be a third party beneficiary of the agreements. The only benefit that Bogle can be said to receive from the agreements is the result, under Arizona partnership law, that its priority as an unsecured bankruptcy creditor of Ocotillo is higher than that of the partners in Ocotillo. The agreements were signed by the appropriate parties, and therefore validly executed.

■ The third prong of the § 1823(e) requirements is also satisfied because the Board of Directors of Old ABQ approved, by resolution dated November 29, 1989, the terms of the settlement agreement and "authorized and directed [the officers of the bank] to execute all documents *necessary to carry out the Agreement." Defendant's Exhibit # 9* (emphasis added). The execution of the Settlement Agreement, therefore, was specifically authorized. In addition, because the Amendment and Waiver Agreement, as will be discussed more fully below, was "necessary to carry out the agreement," the Board of Directors also specifically approved of the execution of this document. Neither *D'Oench* nor 12 U.S.C. § 1823(e) is applicable to this action, and therefore Bogle is entitled to assert its claims, utilizing the Settlement Agreement and Amendment and Waiver Agreement as evidence of RTC/New ABQ's status as a partner in the Ocotillo Joint Venture. The Court must therefore turn to the validity of the agreements, and the resulting effect on Bogle's claims.

## IV. CHOICE OF LAW FOR STATE LAW ISSUES

A Federal District Court, is obligated to apply the law of the state in which it sits. *See generally, Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This adoption of state law has been extended to include the state conflict of law rules. *See Klaxon Co. v. Stentor Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, this Court is obligated to apply the same law in this matter that a New Mexico State Court would apply.

New Mexico has long recognized and upheld the validity of choice of law provisions contained in contracts. *See e.g. Jim v. CIT Financial Services Corp.,* 87 N.M. 362, 364, 533 P.2d 751, 753 (1975) ("The parties here were competent and free to make a choice, inter se, of the law which governs the perfor-mance and enforcement of the contractual arrangements which apparently exist be-tween them"); *Stevenson v. Louis Dreyfus Corp.,* 112 N.M. 97, 98, 811 P.2d 1308, 1309 (1991) ("Although parties are free to choose by contract a law to govern the performance and enforcement of contractual arrange-ments between them, the parties in this case did not do so.") (citation omitted). However, choice of law provisions only extend to sub-stantive law, and the court is free to apply its own procedural law unless the parties' con-tract specifically states otherwise. *See Nez v. Forney,* 109 N.M. 161, 163, 783 P.2d 471, 473 (1989).

In the instant case, each of the documents in dispute specifically state the law which is to be applied in interpreting the document. The following table sets out the law selected in each of these documents.

| DOCUMENT | DATE EXECUTED | CHOICE OF LAW |
|---|---|---|
| Partnership Agreement (3rd Amended) | 1/22/88 | Arizona |
| Settlement Agreement | 1/11/90 | New Mexico |
| Amendment and Waiver Agreement | 1/11/90 | Arizona |

Absent a showing that the parties did not in fact intend to agree on these choice of law provisions, they shall be given full force and effect.

## V. DID RTC/ABQ BECOME A PARTNER IN OCOTILLO?

### A. Settlement Agreement

As discussed previously, this docu-ment was executed on January 11, 1990, and is governed by the law of the State of New Mexico. Under the terms of the Settlement Agreement, Old ABQ and ABQD agreed that in exchange for Old ABQ's forgiveness of debts owing from ABQD, that ABQD "sells, assigns and transfers the *Stock* and *Interest* [in the Ocotillo Joint Venture] to [ABQ] Bank." *Plaintiff's Exhibit J* at 3. Thus, Old ABQ acquired all of ABQD's ownership in-terest in Ocotillo. This ownership interest, by the terms of the Settlement agreement consisted of,

50,000 shares of the common stock (the "Stock") of Amrock Enterprises, Inc., a New Mexico corporation ("Amrock"), con-stituting 100% of the issued and outstand-ing stock of Amrock, and a partnership interest (the "Interest") in Ocotillo West Joint Venture, an Arizona general partner-ship (the "Joint Venture").

*Id.* at 2.

While the document itself does not directly address how it affects ABQD's status as managing partner of Ocotillo, section number 5, entitled "Management Agreement" demon-strates that ABQD no longer maintained the status of managing general partner of Ocotil-lo.

Section 5 provides in relevant part,

After the transfer of the Stock and Inter-est ... Development and the Joint Ven-ture may enter into a management agree-ment ... pursuant to which Development

will manage the assets of the Joint Venture as the agent of the Joint Venture.... The Management Agreement, if any, will also provide that *Development may, subject to the Joint Venture's consent, arrange sales of Joint Venture's real property assets in the ordinary course of the Joint Venture's business, and that Development will be paid a customary real estate commission for arranging such sales.* The Management Agreement, if any, shall be effective upon its execution and delivery by Development and the Joint Venture and the receipt by the Bank of the written consent to the Management Agreement by the Office of Thrift Supervision.

*Id.* at 4 (emphasis added). The fact that this provision is contained in the Settlement Agreement in and of itself shows that the parties recognized that ABQD was no longer a partner in Ocotillo. The underlined portion of the paragraph shows the stark contrast between ABQD's status after execution of the Settlement Agreement, and ABQD's position as managing general partner of Ocotillo under the Third Amended Partnership Agreement, which provided in relevant part,

ABQ [ABQD] shall have the exclusive control over development of the Joint Venture properties and the management of the Joint Venture's business.... Managing Joint Venturer [ABQD] shall be entitled to execute all contracts and documents of purchase, sale or conveyance of Joint Venture assets and mortgaging or encumbering Joint Venture assets ... it being the intent of the parties that the signature of any party other than the Managing Joint Venturer shall not be required.

*Plaintiff's Exhibit H* at 8.

■ Despite the fact that the Settlement Agreement, by its terms, transferred all of ABQD's interest in Ocotillo to Old ABQ, under both Arizona and New Mexico law, which contain almost identical provisions, the

conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners *in the absence of agreement*, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partner-

ship business or affairs, or to require any information or account of partnership transactions, or to inspect the partnership books; but it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled.

Ariz.Rev.Stat.Ann. § 29–227(A) (1989) (emphasis added). Thus, to effectuate the intent of the Old ABQ Board of Directors, as set out in the minutes and resolutions of the November 17, 1989 and November 29, 1989 meetings, it was necessary for the Bank to also execute another document wherein it would become the managing general partner of Ocotillo.

### B. Amendment and Waiver Agreement

■ The Amendment and Waiver Agreement, which was executed simultaneously with the Settlement Agreement, specifically substituted the name "ABQ Bank" for "ABQ Development" in the Amended Partnership Agreement. This document was necessary for at least four reasons. First, as discussed above, the Amendment and Waiver Agreement was necessary to effectuate the intent of the Old ABQ Board of Directors. The Settlement Agreement, by itself did not transfer the Ocotillo property to the bank level as specified by the Board of Directors at their November 17, 1989 and November 29, 1989 meetings. Thus, under the terms of the resolution passed by the Board at its November 29, 1989 meeting, Old ABQ's officers were directed and authorized to sign the Amendment and Waiver Agreement and thereby carry out the will of the Board.

Second, the Amendment and Waiver Agreement was contained in a separate document from the Settlement Agreement because a different choice of law provision was required, due to the fact that the Partnership Agreement was governed by Arizona law, and because different parties were required to execute the Amendment and Waiver Agreement. Under both Arizona and New Mexico law, the substitution of ABQ Bank for ABQD was subject to the approval of Amrock, as the remaining partner in the partnership. ABQD no longer held an interest in the partnership, as is evidenced by the Set-

tlement Agreement, and therefore was not a necessary party to the Amendment and Waiver Agreement. *See e.g., Benton v. Albuquerque Nat. Bank,* 103 N.M. 5, 11, 701 P.2d 1025, 1031 (N.M.Ct.App.1985).

Third, the Board of Directors of Old ABQ had been put on notice that the transfer of the entire Ocotillo Partnership was necessary to satisfy banking regulations after the Valley Note Acquisition. A simple acquisition of the Valley Note was probably not permissible under the regulations. *See* Letter from Robert Heyman, Old ABQ counsel, to the Board of Directors of Old ABQ,

*Defendant's Exhibit # 29,*

The transaction raises several potential issues under applicable law and regulations and the Consent Agreement: the loans to one borrower rules under FIRREA and related regulations, the limitations on equity risk investments under OTS regulations, and operating restrictions imposed by the Consent Agreement. For the reasons discussed below, we think that the transaction does not violate these limitations and restrictions except as has been appropriately consented to by OTS.

*Loans to One Borrower.* Although the note purchased [Valley Note], if treated as a loan made by ABQ to the *Joint Venture* is substantial, it fits within an exception to the limitations as a loan to an entity functioning as a service corporation, operating subsidiary or similar entity. An exception is made for such entities on the notion that such entities operate as mere divisions of the parent financial institution. Moreover, *the purchase of the note may, for certain purposes, be seen as the extinguishment of the Joint Venture's debt on the note, rather than an extension of credit which might be subject to the limitations on loans to one borrower.*

. . . .

*Equity Risk Investment.* As outlined · in our letters to OTS and in conversations between officers of ABQ and OTS officials, *ABQ intends to treat the purchase of the note and the acquisition of the interest of Development in the Joint Venture and the stock in Amrock as the foreclosure of a lien on real estate and thereafter treat those interests as "REO," and OTS has concurred in that treatment. Investments in REO fall outside the equity risk investment limitations.*

(emphasis added).

■ Finally, while the assignment itself would not cause a dissolution of the partnership, it is a basic tenet of partnership law that a general partnership requires two or more partners to be considered a partnership. Thus, the withdrawal of one of the partners, without the substitution of a new partner, would lead to a dissolution of the partnership. *See Benton v. Albuquerque Nat. Bank,* 103 N.M. at 11, 701 P.2d at 1031 ("The partnership was dissolved at the time of the assignment to plaintiff of his father's interest in the partnership. Although an assignment does not itself dissolve the partnership, [N.M.S.A.] Section 54–1–27(A) [and A.R.S. § 29–227], a general partnership, in the absence of written provisions to the contrary, cannot exist with less than two members."); *see also,* Ariz.Rev.Stat. § 29–206 ("A partnership is an association of *two or more persons* to carry on as co-owners of a business for profit") (emphasis added); Ariz.Rev. Stat. § 29–229 ("The dissolution of a partnership· is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business"). Based on the foregoing discussion, it is clear that the execution of the Amendment and Waiver Agreement was necessary to carry out the November 29, 1989 resolution of the Old ABQ Board of Directors, and therefore specifically authorized under the resolution.

## C. OTS Approval

■ The primary difficulty that Bogle has in proving that the January 11, 1990 transactions took effect is showing that the OTS approved of the transactions in writing. This difficulty arises primarily from the fact an OTS official never committed the magic words "the OTS approves of the Settlement Agreement and the Amendment and Waiver Agreement" to writing. However, this deficiency is not in and of itself dispositive. It is clear from the Court's examination of all the

exhibits submitted in this case that the January 11, 1990 letter from M.S. Kieswetter to R. Peters constituted OTS approval of the transaction and approval of the documents necessary to effectuate the transfer of Ocotillo to Old ABQ. Defendant's Exhibits 61(a) through (h) demonstrate the knowledge of the OTS as to the pendency of the transaction, and to its scope and effect. There is therefore no issue of fact that in the context of the day, all parties involved fully understood and believed that the following excerpt from the Kieswetter letter gave OTS approval to the transaction:

Based on our review, it appears that the retirement of the Ocotillo [Valley] note possesses economic merit and is in the best interests of the Institution [Old ABQ]. *We also understand that the payment of this debt is part of a plan to satisfy ABQ Development's overdraft of approximately $14 million at ABQ Bank by upstreaming the Ocotillo property to ABQ Bank.* Therefore, *I take no supervisory object, under the Consent Agreement, to the proposed transaction.*

*Defendant's Exhibit # 25* (emphasis added). As discussed above it is clear that Old ABQ took this language as OTS approval. *See e.g. Defendant's Exhibit # 29* ("However, under the Kieswetter Letter, OTS 'take[s] no supervisory objection, under the Consent Agreement, to the ... transaction.' That operates as the consent of OTS, which waives the relevant restrictions of the Consent Agreement"). It is also clear that ABQD believed that the transaction transferred its interest to Old ABQ. *See Defendant's Exhibit # 60* ("[T]he President and the [ABQD] Board thought that the January 11, 1990 Settlement Agreement between Old ABQ and the Corporation and the Waiver and Amendment Agreement between Old ABQ and Amrock Enterprises, Inc. ("Amrock") acted to make Old ABQ the managing joint venturer of OWJV"). Finally, RTC's actions as managing general partner of Ocotillo make it abundantly clear that RTC itself believed OTS had given its consent.

▇ Under well established tenets of contract law, the terms of a writing are to be given their plain meaning, and ambiguities are to be construed against the drafter. *See Phelps Dodge Corp. v. Brown*, 112 Ariz. 179, 181, 540 P.2d 651, 653 (1975),

The object of all rules of interpretation is to arrive at the intention of the parties as it is expressed in the contract. There are many rules of interpretation which can be utilized in reaching the intent of the parties. These include giving words their ordinary meaning, giving technical terms their technical meaning, reading the contract as a whole, giving effect to the main purpose of the instrument, and interpreting the contract so as to make it effective and reasonable.

(citations omitted); *Schultz & Lindsay Construction Co. v. State of New Mexico*, 83 N.M. 534, 535–36, 494 P.2d 612, 613–14 (1972),

It is logical to assume that the parties to a contract know best what is meant by its terms, and that whatever is done by them during the performance of the contract is consistent with their intent and the meaning of the contract terms as understood by them. Consequently, the construction of a contract adopted by the parties, as evidenced by their conduct and practices, is entitled to great weight, if not the controlling weight, in ascertaining their intention and their understanding of the contract. This is particularly true as to the resolution of ambiguities and uncertainties of meaning in the contract, and especially so if the conduct of the parties manifesting their construction of the contract occurred prior to the development of a controversy between them.

(citations omitted).

▇ There is no doubt in the mind of the Court that were RTC/ABQ attempting to enforce the Settlement Agreement and Amendment and Waiver Agreements against ABQD, RTC/ABQ would have no difficulty—based on the language of the Kieswetter letter and the parties' contemporaneous understanding and subsequent actions—arguing that written OTS approval had been given. The difficulty for Bogle arises from the simple fact that RTC/ABQ is controlling both sides of the game. Unfortunately, for RTC/ABQ, the rules of chess do not permit a

player to play his side of the board until his king is in check, and then flip, the board, taking over the other player's pieces to reap the benefit of the checkmate. Neither does law nor equity permit RTC/ABQ to be a partner in Ocotillo up until the time that it becomes disadvantageous to play the role, and then, one move before checkmate, turn the tables, repudiate its role and reap the benefit in bankruptcy of being a third-party creditor of the partnership. RTC/ABQ made its decision to assume the role of managing general partner of Ocotillo, and shall not be permitted an eleventh hour metamorphosis.

## VI. PAYMENT PRIORITIES

■ Having established that RTC/ABQ Bank is the managing general partner of Ocotillo, the Court must now turn to the effect this has on its payment priority. Under the Arizona Uniform Partnership Act, A.R.S. § 29–231(E), a partnership is dissolved due to the "bankruptcy of any partner or the partnership." As discussed above, Ocotillo is currently in Chapter 11 bankruptcy in the District of Arizona. Once the partnership is dissolved, A.R.S. § 29–240(2) establishes the payment priorities for liabilities of the partnership. Assets are to be distributed to satisfy liabilities in the following order:

(a) Those owing to creditors other than partners;

(b) Those owing to partners other than for capital and profits;

(c) Those owing to partners in respect of capital;

(d) Those owing to partners in respect of profits.

*Id.* Under this scheme, the payment priority of the Notes held by RTC/New ABQ, falls below the payment priority owing to Bogle regardless of whether the Notes are treated as a capital contribution or as a debt of the partnership. As a partner in the Ocotillo Joint Venture, RTC/ABQ is given priority under subsection (b), if the Notes are treated as debt, or subsection (c) if the Notes are treated as a capital contribution. In contrast, Bogle's unsecured debt is given priority under subsection (a).

■ The distribution scheme found in paragraph 10.5 of the Third Amended Partnership Agreement, *Plaintiff's Exhibit H* at 13, provides,

Upon the dissolution of the Joint Venture for any reason, the Joint Venturers ... shall proceed to liquidate the Joint Venture's assets to the extent that they have not already been reduced to cash ... and such cash, if any, and any assets to be distributed in kind ... shall be applied and distributed in the following order of priority:

A. To the payment of debts and liabilities of the Joint Venture (including all debts to the Joint Venturers) and expenses of liquidation.

To the extent that this scheme implies that partner creditors and outside creditors are to be treated on equal footing, it is inconsistent with Arizona law, and shall therefore not be given effect. *See Hanson v. Hanson*, 125 Ariz. 553, 554, 611 P.2d 557, 558 (Ct.App. 1979) ("We have no quarrel with Donald's contention that partners may agree to the distribution of partnership assets so long as the rights of creditors are not prejudiced"); Ariz.Rev.Stat. § 29–215 ("All partners are liable jointly and severally for ... debts and obligations of the partnership"); Ariz.Rev. Stat. § 29–236 ("The dissolution of the partnership does not of itself discharge the existing liability of any partner"); Ariz.Rev.Stat. § 29–218 ("Each partner ... must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits"); Ariz.Rev. Stat. § 29–240(4) ("Partners shall contribute, as provided in paragraph 1, § 29–218, the amount necessary to satisfy the liabilities"). The obligation owing to Bogle farms shall therefore be paid from partnership assets before RTC/New ABQ is entitled to payment.

## VII. BOGLE'S OTHER ARGUMENTS

Having found that RTC/New ABQ is a general partner in the Ocotillo Joint Venture, the Court need not address Bogle's arguments in favor of equitable subordination or partnership by estoppel. The Court notes, however, that each of these claims would have to be denied at this time due to disput-

ed issues of material fact which exist in regard to each theory. Specifically, with regard to the equitable subordination claim, a disputed issue of material fact exists as to whether RTC/ABQ's actions as managing general partner constituted inequitable or wrongful conduct vis-a-vis Bogle. The partnership by estoppel theory would have to be denied at this time because a disputed issue of material fact exists as to whether the extension on the Option Contract, granted by Bogle to RTC/ABQ in April of 1990, constituted detrimental reliance for purposes of this theory. For those reasons, the Court would deny summary judgment on these issues, which would then be preserved for trial.

## VIII. SUMMARY

In summary, the Court finds that RTC/ABQ became the managing general partner of Ocotillo Joint Venture as a result of the January 11, 1990 transactions discussed above. RTC/ABQ's claims, as a partner of Ocotillo, under Arizona and New Mexico law, are therefore subordinate to Bogle's claims as an outside, unsecured creditor.

An order in accordance with this opinion shall be entered.

### ORDER

THIS MATTER came on for consideration of the Defendant Bogle Farms' Motion for Summary Judgment, filed December 16, 1992 and Plaintiff's Motion for Summary Judgment, filed January 25, 1993. A memorandum opinion was entered on this date.

Wherefore,

IT IS HEREBY ORDERED that, Defendant's Motion for Summary Judgment be, and hereby is **GRANTED**, and that judgment be entered on all claims in favor of the Defendant Bogle Farms, Inc.

IT IS FURTHER ORDERED that, Plaintiff's Motion for Summary Judgment be, and hereby is **DENIED**.

IT IS FURTHER ORDERED that, all other motions, currently pending in this action be, and hereby are **DENIED as moot**.