**In re ANGEL FIRE SKI CORPORATION, Debtor.**

**ANGEL FIRE SKI CORPORATION, First National Bank of Santa Fe, a national banking association, also known as Banquest/First National Bank of Santa Fe, Angel Fire Corporation and Sangre De Cristo Limited Partnership IV, a Texas limited partnership, Plaintiffs,**

v.

**PARKER TOWN SQUARE, INC., a Texas corporation and Alfred Staehely, Trustee, Defendants.**

**Bankruptcy No. 11–93–12192 MS. Adv. No. 93–1346 M.**

United States Bankruptcy Court, D. New Mexico.

Jan. 4, 1995.

---

Bill J. Sholer, Trustee, Albuquerque, NM.

Thomas J. Dunn, Albuquerque, NM, for First Nat. Bank of Santa Fe.

David T. Thuma, Albuquerque, NM, for Parker Town Square, Inc.

Daniel Behles, Albuquerque, NM, for debtor.

Leonard K. Martinez–Metzgar, Office of U.S. Trustee, Albuquerque, NM.

## MEMORANDUM OPINION

MARK B. McFEELEY, Bankruptcy Judge.

This matter came before the Court for trial on the merits of the complaint brought by the Trustee for Angel Fire Ski Corporation (Angel Fire Ski), Angel Fire Corporation (Angel Fire) and Sangre de Cristo Limited Partnership IV (Sangre IV) and the First National Bank of Santa Fe (FNBSF) against Parker Town Square (Parker) and Alfred Staehely to determine the validity, priority and extent of liens on property owned by Angel Fire Ski and known for purposes of this litigation as the "ski mountain." Having considered the evidence, the argument of counsel, the briefs, the proposed findings of fact and conclusions of law, and being otherwise fully informed and advised, the Court finds that the Plaintiffs should prevail on Count IX of their complaint, for specific performance.

### FACTS

The controversy in this matter arises out of a series of loan transactions, beginning in March of 1987, between the Sangre de Cristo Limited Partnership I (Sangre I), Sangre IV, Angel Fire and Angel Fire Ski, on the one hand, and, on the other, First Federal Savings and Loan Association of Austin (First Federal), to which defendant Parker is the

successor-in-interest.[1] At the time the First Federal loan was first made, Barclays American/Business Credit, Inc. held a mortgage on the ski mountain (the "Barclays mortgage") (Exhibit 31), which had been given by Angel Fire in 1985 as security for a promissory note in the amount of $16,500,000 (the "Barclays note") (Exhibit 29). The Barclays mortgage was assigned to First Federal as part of the 1987 loan transaction with the Angel Fire entities and remains of record in Colfax County, New Mexico. The question before the Court is whether it was the intent of the parties to the March, 1987 loan transaction that First Federal release the Barclays mortgage on the ski mountain as part of that transaction, or whether the Barclays mortgage remains a valid lien securing a $9,675,000 note owed by Angel Fire and Sangre I to First Federal. If the Barclays mortgage is still valid, the lien position of Parker, First Federal's successor, is superior to that of the FNBSF, which holds a mortgage given by Angel Fire later in 1987 to secure a note for $2,167,000.

Plaintiffs state claims for relief based on (I) reformation, (II) equitable subordination, (III) estoppel, (IV) the dragnet clause, (V) merger, (VI) satisfaction, (VII) equitable lien, (VIII) cancellation/rescission, (IX) specific performance and (X) marshalling. In its answer, Parker asserts a second lien position on the ski mountain, behind a 1981 mortgage guaranteed by the Farmer's Home Administration but prior to FNBSF''s mortgage, and raises affirmative defenses based primarily on the *D'Oench*[2] doctrine and the statute of limitations. Parker also has counterclaimed for attorneys fees.[3] Parker filed a Motion for Summary Judgment on all counts. This Court granted Parker's motion with respect to (IV) the dragnet clause and (VII) equitable lien, and denied summary judgment as to (VIII) cancellation/rescission and (IX) specific performance, finding that those claims are not barred by *D'Oench*. The Court did not rule on the remaining counts, due to the short amount of time between argument on the motion and trial.[4]

*The First Federal loan.*

Sangre I was formed in the early spring of 1987 by Ron Evans, Gary Plante, and Walter Fagan for the purpose of acquiring all of the stock of Angel Fire, which operates a ski area in northern New Mexico. Angel Fire in turn owns all of the stock of Angel Fire Ski. At or about the same time, a limited partnership, Sangre IV, was formed for the purpose of acquiring a hotel now known as the Legends Hotel (the "hotel"), which adjoins the ski mountain property owned by Angel Fire Ski and which was then being foreclosed upon by First Federal. The parties to the new loan transactions expected the transaction to close in March, 1987, when the foreclosure on the hotel would be complete except for the redemption period, that would run by mid-April.

The First Federal loan transaction was a complex matter involving four notes and a number of related documents. As provided

---

1. In 1988, as has happened with so many of our financial institutions, First Federal Savings and Loan Association of Austin was placed in receivership by the Federal Savings and Loan Insurance Corporation. Its loans and mortgages with respect to the Angel Fire loans were acquired by Guaranty Federal Savings and Loan Association, which later changed its name to Guaranty Federal Bank, F.S.B. Defendant Parker Town Square is a wholly owned subsidiary of Guaranty, formed for the purpose of holding the notes executed by the Angel Fire entities, foreclosing on the security interests and mortgages, and insulating Guaranty from any liabilities which might result from the operation of the Angel Fire assets, which include the Legends Hotel and the ski mountain, in the event that they were successfully foreclosed upon or that a receiver was appointed on behalf of the creditor to operate the

assets during the pendency of the foreclosure suit.

2. *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corporation*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), reh'g denied, 315 U.S. 830, 62 S.Ct. 910, 86 L.Ed. 1224 (1942).

3. At trial, the parties stipulated to dismissal of Count II of the Complaint and Count II of Parker's counterclaim, which were based on the Federal Bank Anti–Tying Act, 12 U.S.C. 1971 et seq. Parker's third counterclaim, for determination of all lien priorities, is fully addressed in this opinion.

4. Counts I, III V, VI, VIII, IX, and X remain under consideration.

in the hotel loan agreement (Exhibit 3),[5] First Federal loaned $20,000,000 to Sangre IV (Exhibit SSS)[6] to finance acquisition of the hotel, on which First Federal was foreclosing as a result of a previous loan transaction. Under the terms of a separate loan agreement (Exhibit 4),[7] First Federal also loaned $6,000,000 to Sangre I (Exhibit WWW)[8] to finance its acquisition of the stock of Angel Fire Corporation; $2,500,000 to Sangre I[9] in the form of a letter of credit (Exhibit YYY)[10] to the seller of the Angel Fire stock; and $9,675,000 to Angel Fire (Exhibit 14)[11] in a transaction whereby First Federal paid the balance of the Barclays note, ($8,417,182 as of March 13, 1987), the balance of a note for some $1,000,000 to First Federal Savings and Loan of East Alton, Illinois, and certain closing costs. Under a Modification Agreement (Exhibit 8),[12] the Barclays note (also referred to in the loan documents as the "Angel Fire Note") was merged into the $9,675,000 note with First Federal. As part of the loan transaction,

Barclays assigned the note and mortgage to First Federal (Exhibits 6,[13] 9[14], GGG[15], KKK[16]).

Security documents executed as part of the loan closing were a Deed of Trust, recorded April 24, 1987 (Exhibits 17 and P[17]), given by Angel Fire Ski for Sangre IV to secure the $20,000,000 hotel note. Additionally, to secure the three other notes, the loan agreement between First Federal, Sangre I and Angel Fire (Exhibit 4) provided for a pledge of Angel Fire stock by Sangre I (Exhibit UUU),[18] deeds of trust on real property consisting primarily of lots securing the $6,000,000 note (Exhibit XXX[19]) and the $2,500,000 note (Exhibit ZZZ[20]), the personal guarantees of Evans (Exhibit AAA)[21] and Plante (Exhibit VVV),[22] and an amended security agreement (Ex. 10).[23] Other relevant documents dated March 12, 1987 include Borrower's Closing Statement between Sangre I and First Federal (Exhibit 7); Estoppel Certificate, signed by Angel Fire (Exhibit 5); Fi-

---

5. Contract for Sale, Escrow and Loan Agreement, between Sangre IV as buyer and First Federal as Seller and the Angel Fire and Angel Fire Ski.

6. $20,000,000 Promissory Note, from Sangre IV to First Federal.

7. Loan Agreement, between Sangre I, Angel Fire, Plante, Evans, all of the subsidiary corporations of Angel Fire and First Federal.

8. $6,000,000 Promissory Note, from Sangre I to First Federal (acquisition note).

9. Sangre de Cristo II, another limited partnership, was also a maker on this note.

10. $2,500,000 Promissory Note, from Sangre I and Sangre II to First Federal (Letter of Credit Note).

11. $9,675,000 Promissory Note, from Angel Fire and Sangre I to First Federal.

12. Modification Agreement, between First Federal and Sangre I, Sangre II, Sangre IV, Angel Fire, Angel Fire Ski, Starfire Resorts, Inc., Agency Del Sol, Inc., and Portfolio Services, Inc.

13. Assignment Agreement, between First Federal and Barclays.

14. Assignment of Note and Mortgage, Assignment of Rents and Security Agreement, by Barclays to First Federal.

15. Assignment of Note and Leasehold Mortgage, Assignment of Rents and Security Agreement, by Barclays to First Federal.

16. Assignment of Note and Assignment of Installment Land Contracts, by Barclays to First Federal.

17. Deed of Trust, from Angel Fire Ski for Sangre IV to First Federal.

18. Pledge and Security Agreement, of Angel Fire Stock by Sangre I.

19. Deed of Trust, from Sangre I to First Federal securing $6 million loan (and cross-collateralizing $2.5 million and $9.675 million notes) on lots in Angel Fire Chalets, Unit 5 and lots in Angel Fire West Village.

20. Deed of Trust, from Sangre I and Sangre II to First Federal securing $2.5 million loan (and cross-collateralizing $6 million and $9.675 million notes) on lots in Angel Fire Chalets Unit 5 and Unit 5a as amended.

21. Evans Guaranty, personal guaranty for indebtedness of Sangre I and Angel Fire.

22. Plante Guaranty, personal guaranty for indebtedness of Sangre I and Angel Fire.

23. Amended and Restated Loan And Security Agreement, between First Federal and Angel Fire and Starfire Resorts, Inc.

nancing Statement, on ski area fixtures, contract rights and other items (undated but appears to have been prepared and signed in conjunction with the closing) (Exhibit 16); and Certificate, by Angel Fire and Starfire Resorts, Inc to First Federal, as to the accounts receivable held by those parties (Exhibit HHH).

There was testimony at trial that many of the documents were not ready or fully completed at the closing and that only the signature pages of some documents were signed at that time.

After the loan documents were executed on March 12, 1987, additional documents were prepared and executed. These include the Partial Release (releasing some collateral which had been included in the Barclays mortgage), dated March 16, 1987 (Exhibit 18); the Deed of Trust, from AFC for Sangre I to First Federal securing the $9,675,000 note, dated April 22, 1987 and recorded May 19, 1987 (Exhibit 15); the First Amendment to Amended and Restated Loan and Security Agreement, between First Federal and Angel Fire and Starfire, dated May 6, 1987 (Exhibit 11); the Second Amendment to that agreement, dated June 22, 1987 (Exhibit 12); the Third Collateral Substitution, including the Third Amendment to Amended and Restated Loan and Security Agreement, dated November 18, 1987 (Exhibit 13); and a Subordination Agreement, between First Federal and FNBSF, dated November 30, 1987 (Exhibit 20).

During this time First Federal also prepared and filed in its records the loan applications with committee approval, which approval was given finally on May 27, 1987 (Exhibits 51 and 52).

*The FNBSF loan.*

In November of 1987, after being turned down for additional financing by First Federal, Gary Plante approached Plaintiff FNBSF for financing. FNBSF had originated a loan made to Angel Fire in 1981, secured by a lien on the ski mountain and guaranteed by the Farmers Home Administration (FmHA).

When the First Federal loan was made in March, 1987, the note secured by the FmHA mortgage (Exhibit 2) had a balance of about $900,000. It is undisputed that the "Farmer's Home mortgage" (Exhibit 1) is a first lien on the ski mountain. FNBSF agreed to lend Angel Fire additional funds to be secured by what the bank understood to be a second mortgage on the ski mountain (Loan Agreement, Exhibit 65). When a title search done for FNBSF on October 27, 1987 (Exhibit 60) disclosed the unreleased Barclays mortgage on the ski mountain, Bob Bidal, an employee of FNBSF, called Clark Enright at First Federal and was told that the Barclays note had been paid off. He then wrote a memorandum dated November 3, 1987 to Allen Hamilton, a senior loan officer at FNBSF, indicating that First Federal had "confirmed" that the debt of Angel Fire to Barclays had been paid (Exhibit 19). FNBSF requested that First Federal subordinate its lien [24] on the ski mountain to the new loan that FNBSF was proposing to make, and on November 10, 1987 a Subordination Agreement (Exhibit 20) was executed by First Federal. There is correspondence in the files of First Federal with respect to such agreement (Exhibits 21, 67 and 68).

On November 30, 1987, Angel Fire executed a promissory note payable to FNBSF in the principal amount of $2,167,500 (Exhibit 23). Angel Fire Ski executed a Continuing Guaranty and Agreement (Exhibit 25) and a mortgage on the ski mountain in favor of FNBSF (Exhibit 24). This note was restructured in July of 1990 (Exhibits 27 and 28).

Sometime in 1993, in the course of preparing a foreclosure suit against the borrowers, counsel for Parker discovered that the Barclays mortgage, assigned by Barclays to Parker's predecessor, First Federal, was still of record. Since that time Parker has asserted that it holds a second mortgage position on the ski mountain behind the 1981 Farmer's Home mortgage held by FNBSF but prior to FNBSF's mortgage of November, 1987.

---

**24.** FNBSF operated on the assumption that the only lien held by First Federal on the ski mountain was the third mortgage for $1,000,000 taken by the bank as part of its security for the $20,000,000 hotel note.

## DISCUSSION

Both the testimony and the exhibits cause the controversy before this Court. In numerous conversations with representatives of the borrowers and FNBSF, representatives of First Federal and its successors took the position that they held a third mortgage on the ski mountain subordinate to the Farmer's Home mortgage (Exhibit 1) to FNBSF for the April 1981 note (Exhibit 2) and, additionally, subordinate to the November 1987 mortgage held by FNBSF (Exhibit 24). Gary Plante, Ron Evans and Clark Enright, who was a former officer of First Federal and the person primarily responsible for the origination of the loans from First Federal, all testified that it was the agreement of the parties that the Barclays mortgage on the ski mountain was to be released as part of the March, 1987 loan transaction. On the other hand, William Horabin, who was the Chairman of the Board of First Federal at the time that these loans were made, testified that First Federal never intended to release the Barclays mortgage on the ski mountain.

The documents too, reflect this confusion. Clearly, the assignment of the Barclays lien transferred Barclays' position on the ski mountain to First Federal. Just as clearly, the Partial Release released a portion of the Barclays collateral but did not release the lien on the ski mountain. The Amended and Restated Loan Agreement states that First Federal is the successor-in-interest to Barclays under the Barclays mortgage (Exhibit 10, p. 1), and the Estoppel Certificate contains similar language (Exhibit 5, p. 1). On the other hand, the documents executed in connection with the hotel purchase clearly state that First Federal was to have a third mortgage on the ski mountain (behind the then existing mortgage held by International State Bank [25] and the 1981 Farmer's Home mortgage held by FNBSF) (Exhibit 3, p. 4 ¶ 4), that the third mortgage position was limited to $1,000,000, and that First Federal was agreeing to subordinate that third mortgage position to up to $3.5 million of prior debt (Exhibit 3, p. 12 par. 18). The Sangre IV Deed of Trust (Exhibit 17) is consistent with Exhibit 3. The Subordination Agreement (Exhibit 20) entered into with FNBSF subordinates First Federal's $1,000,000 lien arising from the deed of trust securing the $20,000,000 hotel loan to FNBSF's November, 1987 mortgage without any reference to continued existence of the Barclays mortgage. The correspondence from counsel with respect to the 1987 subordination agreement speaks only of the "lien" of First Federal being subordinated to the two liens of FNBSF (Exhibit 21). Notably, under the Sangre I Deed of Trust securing the $9,675,000 loan used to pay off the Barclays note, the only security provided is certain unimproved lots, again with no mention of a lien on the ski mountain. An auditor's verification letter signed on September 1, 1987 by Clark Enright of First Federal confirms that the security for the $9,675,000 note was "installment real estate contracts and notes receivable." The loan applications, as approved in final form by First Federal on May, 1987 state that its lien was a third lien on the ski mountain (Exhibit 51) and that the Barclays lien was to be *released* (Exhibit 52). Reports written by First Federal and its successor, Guaranty, in connection with efforts to collect the Angel Fire loans state that the bank held a lien on accounts receivable and on three particular lots to secure the $9,675,000 loan and make no mention whatsoever of a lien position on the "ski mountain" except with reference to the "third lien" taken to secure $1 million of the $20,000,000 hotel note (Exhibits 32, 33, 36, 39 and 41). The exhaustive memorandum dated September 8, 1992, prepared by Guaranty in contemplation of litigation refers only to a third lien position on the ski mountain, behind the Farmer's Home mortgage and the FNBSF mortgage, in connection with the $20,000,000 note (Ex. 37, pp. 8–12).

 Witnesses on both sides testified that it was the intent of the parties to the loan transaction to link the ski mountain and the hotel properties. There was one closing for all the loans. The notes and deeds of

---

**25.** A note and mortgage held by International State Bank of Raton, New Mexico had been paid off between March, 1987, when Angel Fire borrowed from First Federal and November, 1987, when Angel Fire borrowed from FNBSF.

trust, including those in connection with the $20,000,000 hotel loan and $9,675,000 loan used to pay off the Barclays note, contain cross-collateral and cross-default provisions. There are numerous cross-references within the various loan documents. Accordingly, the Court finds that the parties intended these documents to be construed together. In order to ascertain the entire agreement between contracting parties, separate documents executed at the same time, for the same purpose, and in the course of the same transaction are to be construed together. *Jim Walter Homes v. Schuenemann*, 668 S.W.2d 324 (Tex.1984). When so construed in this case, ambiguities arise which the court may look to the documents, taken together, to resolve.

■ After careful consideration of the wording of the exhibits and the testimony offered in this trial, I find that the most logical explanation for the wording of the documents and the actions of the parties after the execution of the documents is that there was an agreement that First Federal would release the Barclays mortgage on the ski mountain in conjunction with the closing of the loans and that it failed to follow through on its agreement. The parties contemplated that there would be an advance on the original Barclays loan to pay the indebtedness to the First Federal Savings and Loan of Alton, Illinois, and that the "Barclays" lien on all collateral was to be assigned to First Federal. The only document which is inconsistent with this finding is the Partial Release (Exhibit 18), which was executed only by Mr. Horabin and not by any representative of the borrowers. There was no indication at trial that the Partial Release was ever forwarded to any of the borrowers.

It would appear that a lien on the ski mountain, behind indebtedness of less than $1 million, securing a $9,675,000 note would have been an important piece of collateral to First Federal if it intended to keep the lien as collateral. Yet the Barclays mortgage is not mentioned at all in any of the loan committee approvals. Indeed, Ken Clark, a loan officer who testified at trial that First Federal intended to keep the Barclays mortgage as collateral for the $9,675,000 note nevertheless had written to the Federal Home Loan Bank in July of 1988 as follows:

> "The collateral for this loan is predominantly third party notes receivable from lot sales and some time share sales." (Exhibit 52, letter 7/12/88).

That language is consistent with the language of the original loan application under "remarks" (Exhibit 52, loan application for $9,675,000 loan) approved by First Federal's loan committees that:

> Barclay's had a blanket lien on all real estate and other assets of Angel Fire Corporation. This credit was to facilitate collateralization of the other FFS loans by release of Barclay's lien and to allow Angel Fire Corporation to secure other loans for factoring notes that will pay this loan.

and which also describes the collateral as contracts and notes receivable and three lots, and the language of Exhibit 51, the approval of the hotel loan on the same date, showing as collateral for the hotel loan an "inferior lien on Mountain $1,000,000 subject to no more than $3,500,000 superior liens."

If First Federal did intend to keep the Barclays mortgage as a lien on the ski mountain, it is difficult to fathom the absence in notes and deeds of any reference to the Barclays mortgage. In light of all the evidence, the fact that First Federal took an assignment of the Barclays mortgage does not necessarily mean it thereby intended to retain the mortgage as security. Clark Enright testified at trial that the intent of the parties was to pay off Barclays and release its blanket lien so that collateral could be spread among the new loans, and that First Federal only intended to take a lien on the ski mountain in connection with the hotel loan. Indeed, if First Federal intended to retain the Barclays mortgage as security for its $9,675,000 note, it is not clear why it took an inferior lien of $1,000,000 on the ski mountain to secure the $20,000,000 hotel loan.

*The D'Oench doctrine.*

■ I have already ruled on summary judgment that there were sufficient documents in First Federal's files such that the *D'Oench* doctrine would not preclude the Trustee from prevailing in this action on an

otherwise valid claim. The Court finds that the documents referred to above fairly can be said to show that First Federal was entitled only to an inferior lien on the "ski mountain" to secure no more than $1 million of the hotel loan, and that an agreement to subordinate that lien to up to $3.5 million dollars in additional debt[26] was part of the original loan arrangement. It seems clear that not only did the borrowers operate on this basis, but that First Federal and its successors did likewise. Under these circumstances, the *D'Oench* doctrine is inapplicable. *See RTC v. Ocotillo West Joint Venture*, 840 F.Supp. 1463 (D.N.M.1993) (*D'Oench* doctrine did not estop lien claimant in declaratory judgment action from using loan documents to which it was not a party as evidence of claimed priority right).

■■■■ The *D'Oench* doctrine is a form of estoppel developed under the federal common law. Its original purpose was to preclude parties who were in collusion with bank officers from attempting to hide from bank regulators their secret side agreements only to raise them later as a defense to collection when the government had taken over those institutions because of their insolvency. *See D'Oench, Duhme*, 315 U.S. at 457–60, 62 S.Ct. at 679–81.[27] The focus of the doctrine has evolved away from the fraudulent or secret conduct by the borrower to the effect of those acts on the ability of regulators to accurately assess the assets of a failed financial institution. *Langley v. FDIC*, 484 U.S. 86, 91–92, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987). It is designed to prevent the face value of an institution's assets from being devalued by secret agreements between the institution and the borrowers. *Jobin v. RTC*, 160 B.R. 161, 166 (Bankr.D.Colo.1993). The doctrine applies to any claim or defense which would tend to deceive banking authorities as to the value of assets acquired. *Id.* Typically, *D'Oench* applies when the regulator of a failed financial institution sues a borrower to collect on a promissory note found in the institution's files and the bor-

rower claims the obligation is unenforceable as written because of an additional agreement with the lender. *See, e.g., Mainland Savings Association v. Riverfront Associates, Ltd.*, 872 F.2d 955 (10th Cir.1989) (defendants in action on promissory note precluded from asserting claim for set-off based on oral agreement with bank to fund additional loan); *FDIC v. Rusconi*, 808 F.Supp. 30 (D.Me.1992) (*D'Oench* estopped borrowers and guarantors on four promissory notes from claiming guaranty applied only to one note where documents unambiguous). The doctrine applies to the FSLIC. *Mainland Savings*, 872 F.2d at 956.

■■■■ To raise an estoppel claim under *D'Oench*, the proponent bears the burden of showing that there was (1) a secret scheme or arrangement to which the borrowers lent themselves (2) that had the effect of deceiving banking regulators. *Oklahoma Radio Assoc. v. FDIC*, 987 F.2d 685, 690, 693 (10th Cir.1993).

After reviewing authorities cited by the parties, I have concluded that the elements of *D'Oench* are not met in this case. First, there is no evidence of a secret, side agreement between the Angel Fire entities and First Federal. *See First City Financial Corp. v. FDIC*, 61 B.R. 95 (Bkrtcy.D.N.M. 1986). Although the Trustee does claim the existence of an agreement by First Federal to release the Barclays mortgage as part of the loan transaction, he relies on the documents themselves to substantiate his claim. *See Ocotillo West*, 840 F.Supp. at 1477. Furthermore, the Trustee is asking for a finding that First Federal failed to follow through on a part of the original loan transaction, which the trustee argues can be found in the bank's documents. This is categorically different from asking for enforcement of a secret or unwritten side agreement that would modify an unqualified obligation clearly shown in the bank's records. *See Jobin* 160 B.R. at 168 (trustee's preferential transfer claims not based on secret arrangement or unwritten

**26.** This amount was later changed to $4 million. Exhibit 20.

**27.** In *D'Oench*, the maker of a note gave a $5,000 note to prevent bank examiners from discovering

the loss suffered by the bank in a previous transaction with the maker, with the understanding that the note would not have to be repaid and interest payments would be refunded.

agreement); *In re Nasr*, 120 B.R. 855 (Bkrtcy.S.D.Tex.1990) (*D'Oench* not a bar to debtor's defense of fraudulent inducement in bank's suit on note where bank's claim based on facts surrounding entire loan transaction).

■ Second, it is difficult to see how banking authorities would be misled under these facts because the documents in the bank file are *clearly* contradictory. This is not a case in which the documents are susceptible only to one plausible construction. *Cf. FDIC v. Singh*, 977 F.2d 18, 23 (1st Cir.1992) (nonrecourse provision of promissory note did not limit liability of partners under previously-executed unconditional guaranty, where guaranty was clear and amendment to note referred to guaranty). For the reasons stated previously, the hypothetical bank examiner reviewing the books and records of First Federal documenting the Angel Fire loan would have reason to question whether the Barclays mortgage was an asset of First Federal at all. The fact that the Barclays mortgage was assigned to First Federal does not create the kind of unambiguous obligation, such as appears on the face of a promissory note, which *D'Oench* seeks to protect by ensuring reliance on bank records. "[O]ne who signs a *facially unqualified note* subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities...." *Langley*, 484 U.S. at 93, 108 S.Ct. at 402, emphasis added. The evil prevented under *D'Oench* is allowing a private party to rely upon unrecorded promises that purport to impose obligations other than those appearing in the bank's records. *FDIC v. McCullough*, 911 F.2d 593, 600 (11th Cir., 1990). Here, such an obligation—namely, to give First Federal a lien on the ski mountain pursuant to the Barclays mortgage—is not clear from the bank records and, therefore, it is appropriate to look to the parties' intent with respect to the mortgage without applying *D'Oench*. That it is not misleading to do so is borne out by the subsequent conduct and statements of representatives of First Federal itself and its successors to the effect that the only lien First Federal had on the ski mountain was the third mortgage for $1,000,000 securing the hotel note, which is precisely the conclusion the Trustee asks this Court to reach.

■ Third, given the expectation of the Angel Fire entities that the Barclays mortgage would be released as part of the loan transaction, they did not have reason to believe that by entering into the transaction they were lending themselves to a deceptive scheme. *See Oklahoma Radio Associates*, 987 F.2d at 694 (borrower not estopped from asserting claim that bank agreed to renew one-year loan for five years where no evidence borrower acted in bad faith). The testimony shows that many of the loan documents were not complete when the First Federal loan transaction was closed on March 12, 1987; in at least some instances only signature pages were available. Under these circumstances, it was reasonable for Evans and Plante to rely on their understanding of the transaction based on the loan applications, which do not show that First Federal was retaining the Barclays mortgage (Ex. 51, Ex. 52). *See FDIC v. Meo*, 505 F.2d 790 (9th Cir.1974) (borrower not estopped from avoiding liability on promissory note when bank had improperly executed stock purchase for which loan proceeds were intended). The Court finds that under these circumstances Evans and Plante were not negligent in signing incomplete closing documents. *Cf. FDIC v. McClanahan*, 795 F.2d 512 (5th Cir.1986) (maker of promissory note recklessly signed blank promissory note and delivered it to bank officer he knew had previously been convicted of bank fraud). *But cf. McCullough*, 911 F.2d at 601 (borrower who had executed mortgage and note without insisting on formal closing and had opportunity to examine documents at closing voluntarily associated himself with misleading scheme); *FDIC v. Caporale*, 931 F.2d 1 (1st Cir.1991) (borrowers who had signed notes in blank and bank filled in amounts without authorization estopped from denying liability on notes). Even assuming, arguendo, however, that Evans and Plante were negligent, for the reasons stated above any such negligence did not have misleading consequences.

Therefore, the Court finds that, even under the expanded form of the doctrine, *D'Oench* does not preclude the Court from examining the facts and circumstances surrounding the execution of the documents to resolve the question of what was intended.[28] For the same reasons, I find that 12 U.S.C. 1823(e), the statutory counterpart of *D'Oench*,[29] is inapplicable to these facts. In any event, that provision did not apply to the FSLIC until 1989 and the Tenth Circuit recently held that its strict requirements are not to be applied retroactively. *Oklahoma Radio Associates*, 987 F.2d at 695–96.

*Statute of limitations.*

The next defense raised by Parker is that the statute of limitations bars any action by the Plaintiffs. Parker argues that the statute of limitations to be applied by the Court to this case is the four-year statute with respect to oral contracts[30] or, if the court finds that all of the terms of any agreement are in writing, then the six-year statute with respect to written contracts.[31] It is difficult to determine in this case when the limitations period commenced to run. On the one hand, Parker argues that the limitations period commenced to run on March 16, 1987, when the loan closed, or at some time shortly thereafter. On the other hand, the trustee seems to be arguing that the statute began to run only in 1993, when Parker asserted that

it held a second mortgage on the ski area to secure the $9,675,000 note.

The further argument seems to be that, even if the statute commenced to run at the time of the original closing of the loans in 1987, Parker should be estopped to raise the statute of limitations as a defense based on the conduct of Parker and its predecessors in letting everyone operate under the presumption that the lien had been released. It is uncontroverted that on more than one occasion after 1988, Parker or its predecessors represented that they held a third lien on the ski mountain behind the two mortgages held by FNBSF, both to officers of FNBSF and to principals of the debtors. It is also the position of FNBSF that it acted in reliance on these representations in making the loan in November 1987 and in restructuring that loan in July of 1990.

The statute of limitations for actions based on fraud or mistake begins to run at the time the aggrieved party discovers the fraud or mistake. N.M.S.A. § 37–1–7 (Repl. Pamp.1990). While the courts of New Mexico have read into this statute the requirement that the aggrieved party must exercise reasonable care and diligence in their own actions, *Roscoe v. U.S. Life Title Ins. Co.*, 105 N.M. 589, 734 P.2d 1272 (1987) (statute of limitations barred action against title insurer for alleged negligence in failing to inform

**28.** One wonders if Parker's discovery of the unreleased Barclay's mortgage caused the same reaction that Judge Conway thought that RTC officials might have in similar circumstances, that being: "Someone, at this point, probably said something to the effect of 'well, if we switch around a few ledger entries, repudiate all of our previous representations and then scream *D'Oench, Duhme* and 12 U.S.C. § 1823(e) very loudly, we might be able to come out on top.'" Judge Conway then went on to say "At this point, I imagine that what followed was much back slapping and rejoicing, with everyone leaving the conference room arm-in-arm singing the RTC fight song [to the tune of "Onward Christian Soldiers"],

Onward Banking Soldiers
Marching as if to war,
With *D'Oench, Duhme* and Congress
We'll prevail for sure.
We needn't worry,
We will win the fight
Since we lack accountability,
We are always right. . . . . "

*Resolution Trust Corp. v. Ocotillo West*, 840 F.Supp. 1463 at 1467 (D.N.M.1993).

**29.** That section provides in pertinent part:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) is in writing, (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) has been, continuously, from the time of its execution, an official record of the depository institution.

**30.** N.M.S.A. § 37–1–4 (Repl.Pamp.1990).

**31.** N.M.S.A. § 37–1–3 (Repl.Pamp.1990).

purchasers under real estate contract that mortgage assumed by purchasers contained a balloon payment), they also recognize that the actions of the other-party to an agreement can toll the running of the limitation period. *See Bassett v. Bassett*, 110 N.M. 559, 798 P.2d 160 (1990) (defrauded partner could not have discovered fraud committed by other partner until defrauding partner dissolved partnership and forced defrauded partner from subject property).

Considering all of the circumstances of this matter, I must conclude that the statute of limitations is not a bar to the causes of action asserted by the trustee. The relevant documents were executed over some span of time. The evidence suggests that there was an ongoing pattern of collateral being substituted and released[32] and there seems to be no time certain by which the Barclays mortgage on the ski mountain was to be released. *Roscoe* is distinguishable in that there the existence of the allegedly undisclosed balloon payment was apparent from reading the mortgage that was assumed under a purchase agreement written by the purchaser himself. In the present case, the relevant documents were not prepared by Angel Fire, were not completely available at closing, fixed no date certain for the release of the Barclays mortgage, and are at best ambiguous.

Furthermore, Parker and its predecessors-in-interest continued to represent that they held only a "third lien" on the ski mountain until the summer of 1993. Indeed, on May 27, 1992, Guaranty explicitly described its notes and deeds of trust in correspondence to the Angel Fire entities and principals, making no assertion of a lien on the ski mountain held as security for the $9,675,000 promissory note (Exhibit 48). This adversary proceeding was filed shortly after Parker first attempted to maintain that it held a lien on the ski mountain to secure that note. Based on these facts it is inequitable for Parker to prevail on this defense.

Having found that Parker cannot prevail on its defenses, I conclude that the Trustee should prevail on his complaint, and that the Barclays lien should be released in accordance with what I have found is the agreement of the parties to the original loan transaction. To the extent that FNBSF has raised other claims at the trial which I have not dealt with in the summary judgment ruling, such claims are moot considering the disposition of plaintiffs' claims on Count IX of the complaint. FNBSF's note and mortgage do not provide for attorney fees under these facts. Parker's counterclaim for attorney fees is denied.

This opinion shall constitute the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052. Counsel for the trustee shall prepare an appropriate form of judgment and have same approved as to form by all other counsel participating in this matter, such judgment to be submitted to the Court within ten days.

---

32. See Exhibits 11, 12 and 13 wherein the parties continued to substitute and talk of the release of certain collateral.